**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| WALTER A. TORMASI, | : | |
| | : | |
| Petitioner, | : | Civ. No. 18-16340 (GC) |
| | : | |
| v. | : | |
| | : | **OPINION** |
| ATTORNEY GENERAL OF THE STATE | : | |
| OF NEW JERSEY, | : | |
| | : | |
| Respondent. | : | |

**CASTNER, District Judge**

## I.  INTRODUCTION

Petitioner, Walter A. Tormasi ("Petitioner"), is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  For the following reasons, Petitioner's habeas petition is denied.  A certificate of appealability shall issue though on Petitioner's sole habeas claim should he elect to file an appeal.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Petitioner is incarcerated for murdering his mother, Frances Tormasi.  The New Jersey Superior Court, Appellate Division on Petitioner's direct appeal set forth the factual background giving rise to Petitioner's relevant convictions as follows:

> At the time of the March, 1996 murder, defendant was sixteen years old and resided with his father ("Tormasi, Sr."), his sisters, Sophia and Sonia, and his brother, Attila Tormasi, Jr. ("Attila, Jr." or "Leroy") in Martinsville.  Defendant's parents were separated.  His mother, (hereinafter "Frances"), had moved out of the family home and was living in a boarding home, which she and Tormasi, Sr., owned at 39 Duval Street in Bridgewater.  According to Tormasi, Sr., Frances did not visit the children very often.  Frances's

boyfriend, Daniel Burnett ("Burnett"), was also a resident of the boarding home.

Brian Smith ("Smith"), Sophia's boyfriend, went to the Tormasi home "[a]lmost every day." He recalled that on March 1, 1996, defendant and his father arrived home together at approximately 4:00 p.m., and went into either the bedroom or office. Sophia left for work sometime around 5:00 p.m. Tormasi, Sr., left the home about an hour later.

Lajos Ivan ("Lajos") was the manager of a soccer team to which Attila, Jr., was assigned. On March 1, 1996, Lajos and his wife, Maria, drove over to the Tormasi home to have Attila, Jr., sign a release form since "he requested to leave the team" to join another. The form had to be signed so that Ivan's team was not "overloaded." When Maria drove their car into the Tormasi driveway, Lajos recalled that the headlights illuminated the area and he saw that someone popped up and walked toward the garage. Lajos got out of the vehicle and called out, "Attila." The person looked back but then seemed to walk away. In court, Lajos identified that person as defendant.

However, on the night in question, Lajos assumed that the person was Attila, Jr. He thus followed him to the garage and asked him to sign the form. The person seemed in a hurry, and said that he was "wait[ing] for [his] mother . . . to pick [him] up." Lajos asked him to sign the form, which he did. A few days later, Lajos noticed that the soccer form was signed with the name "Walter Tormasi," and having heard about the murder, turned it over to the police. In any event, at the time Lajos told the person he thought to be Attila, Jr., that he would miss him as a player on the team, the boy responded that he had a job at Rickels. This response "shock[ed] Lajos because as a coach of a team under fifteen-year-olds, it was unclear how a child of that age could be so employed. After saying "good-bye," Lajos shook the boy's hand and noticed he was wearing gloves.

As Lajos started to leave, a Jeep Cherokee pulled up in the driveway, and the person told Lajos that "my mother's here." Lajos gestured for Frances to "pull out" and allow room for the Ivans to pull their vehicle out of the driveway. After the Ivans were driving away they heard "pop-pop-pop," "sharp sounds like a gun."

Maria's account of the evening was essentially the same. At the time she assumed the person speaking to her husband was Attila, Jr., but at trial she thought he was defendant. As they drove away, she saw defendant "smiling" as he approached the Jeep Cherokee.

At approximately 7:00 p.m., Smith, who was in the Tormasi home, heard repeated, rapid, "banging sound[s]." Attila, Jr., got up to see what was causing the sound. Attila, Jr., recalled that he went outside and saw that the driver's side of his mother's Jeep was open. He called out to his mother to say hello, but she did not respond. She was leaning over toward the passenger side "moan[ing], and . . . still alive, barely. Attila, Jr., ran in the house and called "911."

Smith recalled that Attila, Jr., ran back into the house, yelling, "my mom got shot." Smith assumed that defendant was in his bedroom, so he yelled for him, then went to look for him in all the rooms on the main level, including defendant's bedroom, but he was not there.

Bridgewater Police Department Officers Robert Bradley ("Bradley") and Lawrence Boody were dispatched, as was a mobile intensive care unit. When Bradley was trying to attend to Frances, he "observed a silhouette of a figure with his hands raised up, coming out from the side of the attached garage." Bradley "ordered [ ] him to stop" and then noted that the individual was defendant. After defendant was stopped by Detective Wilt, he told Detectives Caravela, Gorski and Wilt that he was waiting for his mother to arrive to take him to Bridgewater Commons Mall, and as she pulled into the driveway, he witnessed an unknown gunman, dressed entirely in black and wearing a ski mask, emerge from the bushes and shoot her. Defendant claimed to have chased the gunman for about a mile-and-a-half through neighbors' lawns and into a field, and that he finally lost him in a wooded area. Defendant did not appear to be perspiring or show any indication that he had been running for a mile-and-a-half. Defendant also told Gorski that the shooting may have been drug related, although after being questioned as to whether his mother was involved in drugs, defendant responded negatively. Gorski then told defendant that his mother was dead.

In the patrol car, defendant subsequently told Detective Bucarey the same story regarding the unknown gunman. Defendant said he had "his own suspicions" about who may have been the assailant, but he did not want to reveal the name.

The police obtained a search warrant of the Tormasi home on March 2, 1996. During the search, the police discovered: a notebook in defendant's bedroom which contained writings related to killing; a pamphlet and warranty card for a Taurus nine-millimeter gun in the den; and an article from the <u>Courier News</u> newspaper which had been circled, addressing the shooting of a retired police officer, Neil

Dougherty ("Dougherty"), at the Tormasi boarding house. They also found a bullet in the wall in the basement. On March 4, 1996, the police found a ski mask in the field. However, they never found the gloves.

At trial, evidence was introduced regarding defendant's alleged involvement in the Dougherty shooting, which occurred less than five months before his mother's murder. The facts of the Dougherty shooting can be summarized as follows. At 8:40 p.m. on October 16, 1995, Officer Bradley of the Bridgewater Police Department responded to a report of a shooting at room number five at the boarding home at 39 Duval Street. This was the boarding home that defendant's parents owned and where his mother and her boyfriend, Burnett, resided. Bradley found Dougherty, the shooting victim, "on his hands and knees[,] [h]is head was in a waste paper basket and he was bleeding. He had been shot twice, but survived his wounds.

The police determined that there were three bullet holes in the window screen of Dougherty's room. There was damage from a bullet to the mirror above the dresser and two bullet holes to the right of the dresser. One bullet went through the wall of Dougherty's room and became lodged in a wall in the adjacent bathroom. The police found a white plastic lounge chair a few feet from the window through which the shots were fired.

The police retrieved three bullets inside the building and found three shell casings outside in the immediate area of the lounge chair; the casings contained the manufacturer marking "Winchester nine millimeter Luger."

A few days after the Dougherty shooting, the lounge chair was processed for latent fingerprints at the evidence garage. Of the seven latent finger and/or palm prints, six were "identified" as belonging to defendant. An eighth "lift" from the chair was a partial footprint of a sneaker, which could not be identified.

The day after the Dougherty shooting, the police obtained a search warrant and conducted a search of the Tormasi home. They found two typewritten receipts for firearms in a nightstand drawer in Tormasi, Sr.'s, bedroom. One document, entitled "gift certificate" and dated October 2, 1995, indicated that a relative of Tormasi, Sr., Jozsef Toth ("Toth"), a Florida resident, had given Tormasi, Sr., a German PO 8 Lugar. The other receipt, entitled "buying and selling agreement," also stated October 2, 1995, indicated that Toth sold to Tormasi, Sr., a nine-millimeter Ruger, a nine-millimeter Taurus, and

a .380 caliber handgun for $1,250.  At trial, Toth and Tormasi, Sr., testified that Toth had given both handguns to Tormasi, Sr., as a gift.

Tormasi, Sr., testified that after a burglary of his home on October 6, 1995, he placed the guns, which had been in his drawer, behind the seat of a dump truck parked at a house he owned in Somerville. When the police came to his house on October 17, 1995, asking questions about the Dougherty shooting, he went out the next day and removed the guns from the dump truck, "chopped them up with a saw," and gave the pieces to the police.

According to Detective Zaslavsky of the Somerset County Prosecutor's Office, on October 18, 1995, Tormasi, Sr., brought to the police a .380 caliber handgun and a Ruger nine-millimeter, cut into fifteen to twenty pieces, thirteen rounds of nine-millimeter ammunition, two of which were Winchester, and six rounds of loose ammunition, all in a cardboard box.

Carlo Rosati, a firearms examiner with the FBI, examined thirteen nine-millimeter bullets recovered from the crime scene of Frances's murder, the Dougherty shooting, and the basement wall of the Tormasi home, and concluded that they all had been fired from the same weapon.  He explained that the microscopic markings on the bullets were produced by the same gun barrel.  He could not identify the specific brand, but noted that the general rifling characteristics of the weapon used were similar to the Berretta, Taurus, Targe, Cobray, and Astra nine-millimeter gun.

Andrea Hamilton ("Hamilton") was defendant's girlfriend between October 1995 and March 1996.  She testified that during that time, defendant's mother was not living in the Tormasi home and defendant did not talk about her "too much."  He did, however, tell Hamilton that he was "mad" at his mother and did not "really like her too much" because "she never really cared about him" or his siblings and she had "cheated' on his father.  At the school library in November or December 1995, defendant told Hamilton that his father had "wanted to shoot [his] mother's boyfriend," so he went to the Duval Street boarding home, "stood on a chair" to reach the window which he fired into, and "shot a cop instead" because his father had "told him the wrong window."  That same day in the library, defendant told Hamilton that his father wanted him to shoot his mother, and that his father had promised to pay him the weekly rental income from the boarding home to do so; however, defendant told Hamilton that he was "not going to get involved in that." Defendant told Hamilton that he had fired guns before and that he "used to be [ ] trigger-happy."  Defendant showed Hamilton a hole

in the basement wall of his home and said that he had fired the gun into the wall.

On cross-examination, Hamilton acknowledged that the night before defendant confided in her in the library, she had told him that since she was his girlfriend, she wanted him to tell her "secrets." She also acknowledged that she could not remember if defendant had told her that he had been accused of the Duval Street boarding house shooting or if he had actually done it. However, on redirect examination, after reviewing the statement that she had given to the police on March 8, 1996, Hamilton recalled that defendant had in fact told her that he had actually done the Dougherty shooting. Hamilton confirmed that she had made plans with defendant to meet him at the mall on the evening of March 1, 1996.

Bradford Krill ("Krill"), who had played sports and had gone to school with defendant since first grade, recalled that on March 1, 1996, while at the school library with defendant and Joseph Alessandra ("Alessandra"), defendant asked Krill if he would ever consider killing a family member, such as his mother or father. Defendant said that he hated his mother and that "[h]e was going to kill" her because "she ran out on the family" and "[l]eft with another man." His mother was picking him up that evening to go to Bridgewater Commons Mall and defendant claimed that he felt like killing someone that day, so "he was going to kill his mother that night." Krill did not tell anyone because he did not "take [defendant] seriously."

Krill knew that defendant "was very fond of" nine-millimeter guns and had talked about getting one for years since eighth grade. Defendant subsequently told Krill that he had obtained a nine-millimeter handgun.

Alessandra related that one week prior to March 1, 1996, while they were at the school library, defendant had asked him how he "would shoot someone that was in a car." Alessandra did not know how to respond, so he did not answer the question.

Andrew Cummings ("Cummings") had also known defendant since first grade and played soccer with him. Cumming's [sic] father was Bedminster's chief of police, a well-known fact at the high school. About ten days before March 1, 1996, Cummings and defendant were in the weight room at the high school when defendant asked him "if [he] knew anything about cleaning gunpowder residue off of [a person's] hands after firing a gun, and whether it could be traced if it was cleaned off." Cummings replied that he did not know.

6

Defendant mentioned that he had a nine-millimeter handgun, which he carried at times and which he had fired.  On March 1, 1996, during first period physical education class, defendant told Cummings that his motto in life was "to keep your friends close and keep your enemies closer so that . . . your enemies would not know that they are actually your enemies."

Robert McGinley ("McGinley") was defendant's probation officer, a fact that was not revealed to the jury.  McGinley testified that in January 1996, defendant had "disdain" for his mother.  Defendant was very upset and "hated" her for the "financial situation that she had put the family in."  She was living for free in one of the properties that his parents owned, while collecting rent from the other tenants there, and being paid alimony by his father.

Jenny Riker ("Jenny") recalled that in August 1995, when she was fourteen years old, she became friends with defendant and would sometimes "hang out" at his house.  A few days before Halloween of 1995, defendant displayed an "automatic" handgun to Jenny in his bedroom.

Eric Diaz ("Diaz"), another classmate and friend of defendant, often "hung out" at defendant's house, but never met his mother who was no longer living there.  Defendant told Diaz that he did not like his mother, that she had done "a lot of bad things to him in the past," and that he "wanted to kill her" because of his mother's Chinese heritage and "he was Chinese."  Diaz had seen defendant with a handgun on "one or two occasions."

In September or October 1995, Diaz, defendant, and Michael Sharpe went to Lynn Toyes' house where defendant pulled out a black handgun that he had hidden in the bushes.  This "scared" Toyes and caused her to run into the house.

Smith also knew that defendant possessed a nine-millimeter handgun and had seen it under defendant's pillow.  Smith witnessed defendant shoot the weapon in the basement of the Tormasi home.

Kenneth Riker ("Riker"), who had gone to school with defendant since sixth grade, was at Warren Acres, a juvenile detention center, when defendant was brought there after the shooting of his mother. Riker testified defendant initially said that he was there on a gun charge, that someone else had shot his mother as she arrived to take him to the mall, and that he had chased the person.  Eventually, within approximately four or five days, defendant asked Riker if police could find gunpowder residue on his clothing or hands if he

shot a gun. Defendant said that he had worn a hat to "cover his hands," so if the police found the hat, it would not have any hairs on it. Defendant eventually admitted that when his mother pulled up in the Jeep, he "shot her" with a nine-millimeter handgun "eight to ten times and then ran." Defendant told Riker that when the police arrived about seven minutes later, he claimed to have chased the unknown gunman, and lied that his heart rate was not elevated because he had been a "junior Olympic runner."

Riker said that defendant had not told him specifically where he then put the nine-millimeter gun. However, defendant also told Riker that he had "shot the cop" at the boarding house, and then "chopped" up the gun with a "rock crusher" that was in his basement and "flushed" the little pieces down the toilet.

(ECF 11-3 at 5-16) (internal citation omitted).

A state court jury convicted Petitioner of murdering his mother, amongst other charges. The New Jersey Superior Court, Appellate Division affirmed Petitioner's convictions but remanded the matter back to the New Jersey Superior Court, Law Division to enter an amended judgment that accorded Petitioner an additional 173 days of jail time credit. (*See* ECF 11-3). The New Jersey Supreme Court denied certification on Petitioner's direct appeal in 2002. *See State v. Tormasi*, 791 A.2d 221 (N.J. 2002).

In July 2002, Petitioner filed his first post-conviction relief ("PCR") petition in the New Jersey Superior Court. (*See* ECF 11-7). Petitioner raised several claims that his court-appointed trial counsel, Lewis N. White, Esq. (hereinafter "White"), was ineffective. (*See id.*). The New Jersey Superior Court denied Petitioner's first PCR petition in July 2007. (*See* ECF 1 at 3). The New Jersey Superior Court, Appellate Division, affirmed that denial in May 2009. (*See* ECF 11-29). The New Jersey Supreme Court denied certification in October 2009. *See State v. Tormasi*, 983 A.2d 199 (N.J. 2009).

Tormasi Sr. died on November 16, 2010. (*See* ECF 14-1 at 124 (letter from Attila Jr. to Petitioner dated November 16, 2010 indicating Tormasi Sr. died earlier that day)). Thereafter, in

December 2011, Petitioner filed another PCR petition. *See State v. Tormasi*, 128 A.3d 182, 184 (N.J. Sup. Ct. App. Div. 2015). That PCR petition asserted newly discovered evidence in the form of an "affidavit" previously unknown by Petitioner. The "affidavit" was purportedly from Tormasi, Sr. and was authored prior to his death. Petitioner asserted that the "affidavit" demonstrated his innocence in his mother's murder. *See id.* More specifically, Petitioner argued the "affidavit" purportedly contained Tormasi, Sr.'s acknowledgement that he hired a private detective, Michael Falcon, to murder Petitioner's mother. *See id.* The New Jersey Superior Court initially held that the "affidavit" was inadmissible as it was not signed, there was no way to authenticate it and that it was inadmissible hearsay. *See id.* at 185. On appeal, however, the New Jersey Superior Court, Appellate Division, reversed and remanded concluding that the reasons given by the PCR Court for excluding the "affidavit" were incorrect. *See id.* at 189.

On remand, the PCR Court judge admitted the "affidavit" into evidence. (*See* ECF 11-76 at 1). Most relevant to Petitioner's federal habeas petition, the PCR Court then denied Petitioner's claim that the "affidavit" established that Petitioner's court-appointed trial attorney had an impermissible conflict of interest which rendered his assistance to Petitioner ineffective when Tormasi Sr. paid White $10,000 in cash purportedly in exchange for Petitioner's attorney not implicating Tormasi Sr. in his wife's murder at Petitioner's trial. (*See* ECF 11-76 at 175-180).

The PCR Court initially determined that there was no conflict established by a parent paying for his child's attorney even if the manner of the payment was improper in the form of cash. (*See id.* at 179). Additionally, the PCR Court found the unsigned "affidavit" "not believable" such that it did not have sufficient weight to probably alter the outcome of Petitioner's trial. (*See id.* at 180).

The New Jersey Superior Court, Appellate Division affirmed the PCR Court's decision on appeal for the reasons given by the PCR Court judge. *See State v. Tormasi*, Dkt. No. A-4261-16T4, 2018 WL 5623953 (N.J. Super. Ct. App. Div. Oct. 31, 2018). The New Jersey Supreme Court denied certification without discussion. *See State v. Tormasi*, 206 A.3d 962 (N.J. 2009).

In November 2018, Petitioner filed this federal habeas petition. (*See* ECF 1). Petitioner raises one claim in his habeas petition; specifically, Petitioner argues that his counsel was ineffective based on the third-party fee transaction between him and Tormasi Sr., which created an impermissible conflict of interest. Respondents oppose Petitioner's habeas petition. (*See* ECF 10 & 11). Petitioner has filed a reply in support of his habeas petition. (*See* ECF 12).

## III.   LEGAL STANDARD

A petition for writ of habeas corpus by a person in custody under judgment of a state court can only be granted for violations of the Constitution or laws or treaties of the United States. *See Engle v. Isaac*, 456 U.S. 107, 119 (1982); *see also Mason v. Myers*, 208 F.3d 414, 415 n.1 (3d Cir. 2000) (citing 28 U.S.C. § 2254). Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214 (Apr. 24, 1996), applies. *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d).

As a threshold matter, a court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)). "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle set forth by the Supreme Court at the time the state court renders its decision." *Id.* (citations omitted). A federal habeas court making an unreasonable application inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *See Williams v. Taylor*, 529 U.S. 362, 409 (2000). Thus, "a federal court may not issue a writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. Furthermore, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e); *see also Rice v. Collins*, 546 U.S. 333, 339 (2006) (petitioner bears the burden of rebutting presumption by clear and convincing evidence); *Duncan v. Morton*, 256 F.3d 189, 196 (3d Cir. 2001) (factual determinations of state trial and appellate courts are presumed to be correct).

The AEDPA standard under § 2254(d) is a "difficult" test to meet and is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). A petitioner carries the burden of proof and with respect to review under § 2254(d)(1), that review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 563 U.S. at 181.

In applying AEDPA's standards, the relevant state court decision that is appropriate for federal habeas corpus review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d

256, 289-90 (3d Cir. 2008).  Furthermore, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

## IV.    DISCUSSION

### A.  Petitioner's Claim

Petitioner asserts that his court-appointed trial counsel had an impermissible conflict of interest when Tormasi Sr. paid him $10,000 in exchange for not implicating Tormasi Sr. in his wife's murder at Petitioner's trial.  Petitioner relies on facts set forth in the "affidavit" purportedly created by Tormasi Sr., but not disclosed to Petitioner until after Tormasi Sr. died in November 2010.  Ultimately, the Superior Court found this "affidavit" not believable.

### B.  New Jersey Superior Court, Law Division Decision

The last reasoned decision on this claim and the non-believability of this "affidavit" is from the New Jersey Superior Court which denied Petitioner's most recent PCR petition.  That court noted as follows in analyzing the credibility of Tormasi Sr.'s "affidavit"[1] as well as Petitioner's corresponding claim in his PCR petition related to a purported impermissible conflict of interest related to matters discussed within the "affidavit":

> The document is thirty-eight pages, lacking its last page, where the signature was supposedly contained.  The document in question purports to contain Attila [Tormasi], Sr.'s acknowledgement that he hired a private detective to commit the murder for which defendant was convicted.  Additionally, the affidavit indicates that Attila [Tormasi], Sr. paid defendant's appointed counsel to ensure that he (Attila [Tormasi], Sr.) not be implicated in the murder and the defense that he had actually been the one to orchestrate the murder not be presented to the jury.  The letter states that Attila [Tormasi], Sr. hired Michael Falcon to murder his estranged wife, Frances

---

[1] The PCR court designated the Tormasi Sr. document at the center of Petitioner's habeas claim as a "letter."

Tormasi. It also claims that defendant's attorney, Lewis N. White, Esq., was ineffective due to an unwaivable conflict that arose when White accepted $10,000 in cash from Attila [Tormasi], Sr. in exchange for not implicating him in the murder of Frances at defendant's trial . . . .

Attila [Tormasi] Sr. owned multiple properties which he rented to supplement his income. One of these properties was located at 39 Duval Street, Bridgewater, New Jersey. One of his tenants at this location was a man named Dan Burnett. In his letter, Attila [Tormasi], Sr. states that on November 22, 1994 he caught Frances "intimately kissing" Burnett at the Bridgewater property. Attila [Tormasi] Sr. would catch his wife talking with and spending time with Burnett several more times over the next few weeks, all resulting in significant altercations. Ultimately Frances moved into a room in the Bridgewater property adjacent to the room that Burnett occupied. On December 5, 1994 Frances filed for divorce. Attila [Tormasi] Sr. alleges that in January of 1995 he discovered that Frances had unilaterally withdrawn large sums of money intended as college funds for their four children in the amount of approximately $120,000. The letter goes on to state that "[t]hen and there, I decided to have Frances killed in response to her theft of large sums of money, her commission of adultery, and in order to alleviate equitable distribution of marital assets required by the divorce." Attila [Tormasi], Sr. Affidavit § 18.

In mid-January of 1995 Attila [Tormasi] Sr. states that he sought out a private investigator for his pending divorce. The letter claims that he ultimately met with Michael Falcon, the manager and lead investigator of a firm called the Atlantis Detective Bureau. During their meeting Falcon allegedly agreed to "extinguish" the problem for a fee of $25,000. Attila [Tormasi] Sr. states that he began saving to make this payment and stole a load [sic] .25-caliber Raven MP-25 semiautomatic handgun while performing electrical work in someone's home.

The letter states that Falcon stayed at the Bridgewater rooming house and conducted two days of video surveillance of Dan Burnett and Frances Tormasi. The surveillance allegedly confirmed the adulterous activity occurring between Frances and Burnett, and at that time Attila [Tormasi] Sr. states that "I decided to have Burnett killed in addition to Frances." Id. ¶ 30. The letter states that Attila [Tormasi] Sr. then attempted to supply Falcon with the Raven MP-25 he had stolen in order to carry out the murders. Falcon indicated that he required a large caliber firearm such as a ".380 or 9 millimeter." Id. The letter states that in mid-August 1995 Attila

[Tormasi] Sr. contacted his uncle, Jozsef Toth, at his home in Jacksonville, Florida. Although he had not seen his uncle in over fifteen (15) years, Attila [Tormasi] Sr. claims that he was able to convince his uncle to purchase and bring to him in New Jersey a 9-millimeter Taurus PT92, a 9-millimeter Ruger P89, a .380 caliber AMT Backup, and two boxes of Winchester 9-millimeter ammunition. Id. ¶ 41. The letter states that his uncle required him to sign a typewritten receipt titled "Buying and Selling Agreement." After his uncle left, Attila [Tormasi] Sr. states that he tested the Taurus by firing it at a piece of plywood in the basement of his home. He states that the bullet went through the plywood and into the cinder-block base of the crawl space, though he was unable to retrieve it.

Shortly thereafter Attila [Tormasi] Sr. is supposed to have given the Taurus and $15,000 to Falcon, who assured him that Burnett would be killed within thirty (30) days. On October 16, 1995 one of Attila's [Tormasi] Sr.'s tenants at his Bridgewater property, Neil Dougherty, was shot. Attila [Tormasi] Sr. states that Falcon had attempted to kill Burnett but had shot the wrong person. During a search of Attila [Tormasi] Sr.'s home[,] officers located the receipt of his purchase of the three firearms from his uncle. Attila [Tormasi] Sr. agreed to surrender the guns the following morning, but before surrendering them he cut them apart with an electric saw in attempt to obstruct any ballistic testing. He then told Falcon to "lay low" for several months until the police pressure subsided.

The letter goes onto say that in February of 1996 Attila [Tormasi] Sr. informed Falcon that he had decided to abandon his plan to have Burnett killed and proceed with the murder of Frances instead. They arranged for Falcon to arrive on March 1, 1996, one hour before Frances was scheduled to pick up defendant to take him to the mall. Attila [Tormasi] Sr. [c]laims that Falcon agreed to carry out the murder for $10,000, thereby crediting Attila [Tormasi] Sr. for the $15,000 that had already been paid for the botched attempt to murder Burnett. Attila [Tormasi] Sr. showed Falcon a getaway route, and concocted a plan to plant fabricated evidence along the getaway route in the form of a ski mask with hair from another person's head, though the letter does not identify that person.

On March 4, 1996, shortly after Frances was killed, defendant was arrested and charged with her murder. Attila [Tormasi] Sr.'s letter indicates that he was "shocked when I received this information. I had not anticipated that Walter would be arrested and charged in connection with the murder." Id. ¶ 71. However, his "desire to avoid criminal prosecution remained paramount and took

precedence." Id. ¶ 72. Thus, Attila [Tormasi] Sr. claims, he allowed his oldest son to suffer the punishment for his malfeasance. The letter goes onto state that, in furtherance of his effort to avoid punishment, Attila [Tormasi] Sr. wrote two checks to defendant's attorney, Lewis White, totaling $10,000, to insure [sic] that White did not implicate Attila [Tormasi] Sr. in the murder. Yet defendant's attorney did exactly that at trial and presented this alternative theory to the jury, emphasizing it in both his opening and closing statements.

The Supreme Court has held that in order for newly discovered evidence to entitle a party to a new trial, the evidence must be:

> 1) Material to the issue and not merely cumulative or impeaching or contradictory;
> 2) Discovered since the trial and not discoverable by reasonable diligence beforehand; and
> 3) Of the sort that would probably change the jury's verdict if a new trial were granted.

State v. Artis, 36 N.J. [53]8, 541 (1962).

Newly discovered evidence must be capable of casting doubt upon the verdict to warrant a new trial. State v. Carter, 85 N.J. 300, 314 (1981). In the instant case the letter presented as newly discovered evidence was produce[d] under suspicious circumstances and contradicts much of the other evidence, Attila [Tormasi] Sr.'s own prior testimony being among such contradictory evidence.

A certification filed by Attila [Tormasi] Sr. in support of defendant's first PCR petition is in direct contradiction to the contents of the letter. In the certification Attila [Tormasi] Sr. states that "[o]n October 6, 1995, someone burglarized our home at 1828 Middle Avenue, Bridgewater." In the letter Attila [Tormasi] Sr. states that this burglary was staged to "account for the disappearance of the 9-millimeter Taurus." The letter claims instead that the weapon was ultimately given to Falcon along with $15,000 to murder Dan Burnett. At defendant's trial Attila [Tormasi] Sr. testified that he did not request that his uncle bring him guns and that his uncle showed up unexpectedly. The letter states exactly the opposite. The letter consistently contradicts Attila [Tormasi] Sr.'s testimony at defendant's trial as well as his certification to the Court. The substantial number of Attila [Tormasi] Sr.'s statements that are inconsistent with the contents of the letter leads unavoidably to the conclusion that Attila [Tormasi] Sr.'s claims in the letter are not credible. Attempts by witnesses to "nullify their prior accounts of

criminal activity" through recantation has been held to be "inherently suspect." State v. Engel, 249 N.J. Super. 336, 386 (1991). "Courts general regard recantation testimony as suspect and untrustworthy." Carter, 85 N.J. at 427. Attila [Tormasi] Sr. is simply not a credible witness.

Defendant's siblings, Sophia and Attila Jr., have testified that they found the letter several years ago, before the death of their father, and that their father had confessed to them that everything in the letter was true, though he refused to discuss details. [ ]  In Sophia's certification to the Court she states that she saw the entire letter in the "mid-or late 2000s", including the missing last page, which she states was signed and notarized in 2003.  They did not reveal this to their brother while he sat in jail.  Sofia has testified that this was out of fear of their father's reaction.  However, their father died on November 16, 2010, and Attila, Jr. sent defendant a letter on that same day informing defendant of the pending sale of their father's properties and the amount of his prospective inheritance.  The correspondence made no mention of the fact that their father had written a letter confessing to their mother's murder.  There was no indication that the siblings might be searching through their father's possession[s] in an attempt to find the letter and potentially save their brother from spending his life in prison.  Defendant's siblings waited six more weeks to inform defendant of their father's confession.

It was no secret that defendant believed that his father had hired Falcon to kill his mother.  Defendant put forth this theory, specifically naming Falcon as the killer, in his second supplemental PCR, filed December 29, 2006.  At one point the family had even hired a private detective to investigate Falcon.  The detective was unsuccessful in locating any evidence that might implicate Falcon in the murder.  While this is going on, or shortly thereafter, the siblings become aware of a written notarized confession, signed by their father, implicating Falcon in the murder.  They confront their father about the letter and he admits that its contents are accurate.  Yet they say nothing to their brother for years, knowing that he has been vigorously pursuing a theory for which they now have substantial evidence.  This behavior is incredible and difficult to reconcile with their testimony.

Finally, there was overwhelming evidence presented at defendant's trial implicating the defendant in the murder of his mother.  Two witnesses placed defendant in the driveway, wearing white "silken" gloves as he approached her car, seconds before she was shot.  Defendant's girlfriend and another friend testified that defendant

had told them earlier that day that he planned to kill his mother by shooting her when she arrived to take him to the mall. Two witnesses testified that defendant said his father was going to pay him to kill his mother. Defendant had asked one of the witnesses how to remove gun residue from his hands after firing a gun. Another witness testified that defendant asked him how he could shoot someone who was sitting in a car. Several witnesses testified that defendant possessed a nine millimeter handgun before the murder.

A witness testified that while in detention after the murder, defendant admitted that he killed his mother and then made up a story about chasing a masked man into the woods. The first officers on the scene of the murder encountered defendant and, after defendant had told the officers of the masked man that he had chased away, defendant explained that he was not breathing hard or sweating because he was a "pre-Olympic runner."

Defendant Tormasi raises as the ultimate issue in his third PCR, the fact that his father paid his attorney $10,000 presents a conflict which is not waivable and practically automatically entitles him to a finding of ineffective assistance of counsel.

This Court finds that the mere assertion of the claim does not establish a conflict of interest because there is no conflict established by a parent paying for his child's attorney even if the manner of payment is improper i.e.: cash.

The prior PCR Judge found that attorney White was not ineffective by failing to investigate and present evidence and implicating defendant's father, Attila [Tormasi] Sr., in the murder. This decision was affirmed by the Appellate Division and Certification was denied by the Supreme Court DTPA 72; Da455; (Docket No. A-2248-07T4, App. Div. decided May 26, 2009). Therefore, White was acting reasonably as an attorney would, when he advanced trial status [sic] he did not play into the State's evidence and the State's theory of the case.

The defendant relies upon the case of Cuyler v. Sullivan, 446 US 335 (1980) for the proposition that this Court should ignore Attila [Tormasi] Sr.'s purpose for paying White and utilize an objective standard consisting of two elements: (1) that the actual conflict of interest existed; and (2) [t]he counsel performance would "adversely affect him."

The Court finds that the defendant's reliance upon Sullivan is inappropriate. The "Sullivan Court" held,

> that the possibility of a conflict is insufficient to impugn a criminal conviction.   In order to demonstrate a violation of his Sixth Amendment Rights, a defendant must establish that an actual conflict of interest adversely affected his lawyers' performance. Id. at 350.

In Sullivan, the defendant and his two co-defendants were represented by the same two lawyers, Id. at 337-38.   Sullivan accepted representation by his co-defendants' attorneys because he could not afford an attorney of his own.   Ibid.   One of Sullivan's attorneys advised him not to present a defense because it would adversely affect his co-defendant's trial. Id. at 338-39. Sullivan was convicted as co-defendants were acquitted in separate trials.   Ibid.

In rejecting Sullivan's claim of ineffective assistance of counsel based upon the conflict of interest. [sic]  The U.S. Supreme Court held "that the mere possibility of a conflict[ ] insufficient to impugn a criminal conviction." Id. at 350. Similarly, here, the defendant suggests that merely because his father *might* have paid White not to focus on Attila [Tormasi] Sr.'s motives to kill Francis [sic] Tormasi, his wife, that this criminal conviction should be overturned. The Court disagrees.

After considering all of the evidence it is clear to this Court, even giving the affidavit and evidence its full weight the Defendant cannot show that but for his attorneys' efficient conduct, the outcome of the trial would have been different and his PCR is therefore denied.

Both Attila [Tormasi] Sr. and White are now deceased. Falcon has testified and has denied any involvement in the murder. There is no one else with direct personal knowledge of material facts outside the record that could be called to testify as to the veracity of the letter's contents. Therefore, having considered the totality of the evidence, *the Court concludes that the letter of Attila [Tormasi] Sr. is not believable* and as such it does not have "sufficient weight" so as to "probably alter the outcome of the [original] verdict." State v. Ways, 180 N.J. 171, 187-88 (2004).

(ECF 11-76 at 175-80 (emphasis added)).

C. *Strickland &  Conflict of Interest Standards*

The Sixth Amendment guarantees effective assistance of counsel.   In *Strickland v. Washington,* 466 U.S. 668 (1984), the United States Supreme Court articulated the two-prong test for demonstrating when counsel is deemed ineffective.   First, a petitioner must show that considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *See id.* at 688; *see also Grant v. Lockett,* 709 F.3d 224, 232 (3d Cir. 2013) (noting that it is necessary to analyze an ineffectiveness claim considering all circumstances) (citation omitted).  A petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. *See Strickland*, 466 U.S. at 690.  Under this first prong of the *Strickland* test, scrutiny of counsel's conduct must be "highly deferential." *See id.* at 689. Indeed, "[c]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.   The reviewing court must make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.  If counsel makes "a thorough investigation of law and facts" about his plausible options, the strategic choices he makes accordingly are "virtually unchallengeable." *Gov't of Virgin Islands v. Weatherwax*, 77 F.3d 1425, 1432 (3d Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91).  If, on the other hand, counsel pursues a certain strategy after a less than complete investigation, his choices are considered reasonable "to the extent that reasonable professional judgments support the limitations on investigation." *Rolan v. Vaughn*, 445 F.3d 671, 682 (3d Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91).

The second prong of the *Strickland* test requires a petitioner to affirmatively prove prejudice. *See* 466 U.S at 693. Prejudice is found where "there is a reasonable probability that,

but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*; *see also McBridge v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 102 n.11 (3d Cir. 2012). "This does not require that counsel's actions more likely than not altered the outcome, but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 111-12 (2011) (internal quotation marks and citations omitted).

"With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice [...] that course should be followed.'" *Rainey v. Varner*, 603 F.3d 189, 201 (3d Cir. 2010) (quoting *Strickland*, 466 U.S. at 697).

When assessing an ineffective assistance of counsel claim in the federal habeas context, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which "is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Grant*, 709 F.3d at 232 (quoting *Harrington*, 562 U.S. at 101). "A state court must be granted a deference and latitude that are not in operation when the case involves [direct] review under the *Strickland* standard itself." *Id.* Federal habeas review of ineffective assistance of counsel claims is thus "doubly deferential." *Id.* (quoting *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011)). Federal habeas courts must "take a highly deferential look at counsel's

performance" under *Strickland*, "through the deferential lens of § 2254(d)." *Id.* (internal quotation marks and citations omitted).

Courts have also stated and analyzed ineffective assistance of counsel claims involving potential conflicts of interest as follows:

> [t]he Sixth Amendment guarantees a criminal defendant counsel's "undivided loyalty free of conflict of interest." *Gov't of Virgin Islands v. Zepp,* 748 F.2d 125 (3d Cir. 1984). This requirement is an essential foundation of our adversarial system of justice, providing the minimum necessary to ensure that criminal defendants receive representation that "puts the government to its proofs in an adversarial manner." *United States v. Moscony,* 927 F.2d 742, 748 (3d Cir. 1991). When an attorney's representation is corrupted by conflicting interests, he or she "breaches the duty of loyalty, perhaps the most basic of counsel's duties." *Strickland,* 466 U.S. at 692, 104 S. Ct. at 2067. In such circumstances, the precise impact on the defense is so difficult to measure, and the possibility of prejudice so great, that we scrutinize the facts differently than in other ineffective assistance of counsel cases. *Id.*
>
> Specifically, counsel is ineffective if he or she "actively represented conflicting interests", and an actual conflict of interest adversely affected the lawyer's performance. *Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S. Ct. 1708, 1719, 64 L. Ed. 2d 333 (1980). Unlike the case in which a defendant argues only that counsel pursued flawed trial strategies, if the accused shows that an actual conflict of interest tainted counsel's performance, we will presume prejudice. *Strickland,* 466 U.S. at 692, 104 S. Ct. at 2067; *United States v. Gambino,* 864 F.2d 1064, 1070 (3d Cir. 1988) ("To reach the level of constitutional ineffectiveness the conflict must cause some lapse in representation contrary to the defendant's interests but such lapse need not rise to the level of actual prejudice.") (citation omitted). If the accused can establish only a potential conflict of interest, prejudice must be proved. *See U.S. v. Acty,* 77 F.3d 1054, 1057 n.3 (8th Cir. 1996); *Stoia v. United States,* 22 F.3d 766, 770 (7th Cir. 1994).

*Hess v. Mazurkiewicz*, 135 F.3d 905, 910 (3d Cir. 1998); *see also United States v. Scarfo*, 41 F.4th 136, 189 (3d Cir. 2022) (citing *Mickens v. Taylor*, 535 U.S. 162, 171 (2002)) (noting that where there is an actual conflict of interest rather than merely a theoretical division of loyalties, the

defendant need not make a separate showing of prejudice). "[I]n order to prove an actual conflict, the petitioner must show: (1) that some plausible alternative defense strategy or tactic might have been pursued; and (2) that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *Id.* at 106 (citing *United States v. Gambino*, 864 F.2d 1064 (3d Cir. 1988)).

D. <u>Analysis</u>

Petitioner asserts that the New Jersey Superior Court's denial of his ineffective assistance of counsel claim based on trial counsel's purported actual conflict of interest was contrary to clearly established federal law in three respects. More specifically, Petitioner argues that the PCR Court's May 2017 ruling contravened United States Supreme Court authority by: (1) concluding that no conflict existed; (2) deeming *Sullivan* inapplicable; and (3) insisting that Petitioner demonstrate actual prejudice. (*See* ECF 12 at 34).

As indicated above, the Superior Court explained that a parent, in this case, Tormasi Sr., paying Petitioner's court-appointed attorney would not, in and of itself, establish an actual conflict of interest. Thus, the Superior Court did not presume prejudice on this ineffective assistance/conflict of interest claim and ultimately found there was a lack of prejudice.

Step one of this Court's analysis is to determine whether that holding was contrary to, or an unreasonable determination of clearly established federal law. For the reasons described *infra*, the Superior Court did not act contrary to or unreasonably apply clearly established federal law by so holding no actual conflict such that prejudice should be presumed. Nevertheless, that does not end this Court's analysis. Once that determination has been made, step two requires this Court to review the Superior Court's factual finding as to the non-believability of Tormasi Sr.'s "affidavit." What is contained in the "affidavit," is essentially the hook that Petitioner must use to show

prejudice.   However, for the reasons described *infra*, Petitioner fails to show by clear and convincing evidence that the Superior Court erred in this factual finding.   Once that analysis is complete, this Court then examines whether Petitioner has shown prejudice, more specifically, whether Petitioner has shown to a reasonable probability that the outcome of his proceeding would have been different.   There again Petitioner fails to make that showing.

1.  *Step One – The Superior Court's statement that the mere assertion of a parent paying for a child's attorney does not automatically create an actual conflict of interest such that prejudice should be presumed was not contrary to, nor an unreasonable application of clearly established federal law.*

In arguing that the Superior Court acted contrary to United States Supreme Court precedent, Petitioner relies heavily on *Cuyler v. Sullivan*, 446 U.S. 335 (1980) and *Wood v. Georgia*, 450 U.S. 261 (1981).   Because both cases are relied upon so heavily by Petitioner, reciting the relevant facts and holdings of both cases is appropriate.

In *Sullivan*, the petitioner was indicted along with two other individuals for murdering two people.   *See* 446 U.S. at 337.   Two privately retained attorneys (G. Fred DiBona and A. Charles Peruto) represented all three defendants throughout the state criminal proceedings.   *See id.* Sullivan's trial was first.   *See id.* at 338.   The case against him was circumstantial and the defense rested without presenting any evidence.   *See id.*   Sullivan was convicted, but his co-defendants were acquitted at separate later trials.   *See id.*   Sullivan sought state collateral relief arguing his counsel was ineffective because they represented conflicting interests.   *See id.*   The Pennsylvania Supreme Court determined that there had been no dual representation in the true sense of the term because Peruto merely assisted DiBona in Sullivan's trial and DiBona merely assisted Peruto in the trials of the other two defendants.   *See id.* at 339.

Petitioner then sought federal habeas relief.   On certiorari to the United States Supreme Court, the issue became whether a state prisoner can obtain a federal writ of habeas corpus by

showing that his retained defense counsel represented potentially conflicting interests. *See id.* at 337. With respect to showing a Sixth Amendment violation, the United States Supreme Court explained that "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest actually affected his lawyer's performance." *See id.* at 348 (footnote omitted). Further, where a defendant who shows that a conflict of interest actually affected the adequacy of his representation, that defendant need not demonstrate prejudice in order to obtain relief. *See id.* at 349-50. Nevertheless, the United States Supreme Court noted that "until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *See id.* at 350 (citation omitted). Ultimately, the United States Supreme Court reversed and remanded the United States Court of Appeals for the Third Circuit's decision stating as follows:

> [Sullivan] emphasizes Peruto's admission that the decision to rest Sullivan's defense reflected a reluctance to expose witnesses who later might have testified for the other defendants. The petitioner, on the other hand, points to DiBona's contrary testimony and to evidence that Sullivan himself wished to avoid taking the stand.

*Id.* As these conflicting contentions were not weighed by the Third Circuit, the United States Supreme Court vacated and remanded the case for further proceedings. *See id.*

In *Wood*, three petitioners (two employed at the Plaza Theater in Atlanta and one employed at the Plaza Adult Bookstore) were convicted of distributing obscene materials and sentenced to probation provided they made regular installment payments toward the satisfaction of substantially levied fines. *See Wood*, 450 U.S. at 262. When three months had elapsed though, and petitioners had not paid any of the required payments on their fines, probation officers moved to revoke petitioners' probation. *See id.* at 263-64. The petitioners admitted they failed to make payments to their fines, but stated they expected their employer to pay the fines for them. *See id.* at 264.

In *Wood*, the petitioners were represented by a single lawyer who was provided to them by their employer. *See id.* at 266. While petitioners were told that their employer would pay any fines and post any necessary bonds, the employer declined to provide money to pay for the fines. *See id.* at 266-67. The United States Supreme Court explained that since it was the decision of the employer not to pay the fines that placed petitioners in their current predicament, and since their counsel had acted as the agent of the employer and was paid by the employer, the risk of a conflict of interest was evident. *See id.* at 267. The United States Supreme Court expressed concern that the employer was using its employees as a test case on whether there was an equal protection claim. *See id.*

The United States Supreme Court noted in *Wood* that "[c]ourts and commentators have recognized the inherent dangers that arise when a criminal defendant is represented by a lawyer hired and paid by a third party, particularly when the third party is the operator of the alleged criminal enterprise." *See id.* at 268-69. The United States Supreme Court continued by explaining that:

> Petitioners were represented by their employer's lawyer, who may not have pursued their interests single-mindedly. It was his duty originally at sentencing and later at the revocation hearing, to seek to convince the court to be lenient. On the record before us, we cannot be sure whether counsel was influenced in his basic strategic decisions by the interests of his employer who hired him. If this was the case, the due process rights of petitioners were not respected at the revocation hearing, or at earlier stages of the proceedings.

*Id.* at 271-72. Accordingly, the United States Supreme Court remanded the case so that a hearing could be held to determine whether the conflict of interest that the record strongly suggested in fact existed, and, if an actual conflict existed at that time, and noted, if there was no valid waiver of the right to independent counsel, a new probation revocation hearing for petitioners needed to be held whereby petitioners would be represented by an untainted attorney. *See id.* at 273.

Over twenty years after *Sullivan* and *Wood*, the United States Supreme Court was presented with another attorney conflict issue in *Mickens*, 535 U.S. 162. In *Mickens*, the petitioner was charged and eventually convicted of premeditated murder. *See id.* at 164. At the time of the murder, petitioner's court appointed counsel was representing the murder victim on assault and concealed weapons charges. *See id.* Petitioner's counsel in *Mickens* though did not disclose this fact to the court at petitioner's trial. *See id.* at 165. The same judge who was handling the victim's criminal case appointed the same counsel to petitioner in his murder case. *See id.* The issue then in *Mickens* became what a petitioner needed to show in order to demonstrate a Sixth Amendment violation when the trial court failed to inquire into a potential conflict of interest about which it knew or reasonably should have known. *See id.* at 164.

Initially, the United States Supreme Court in *Mickens* noted that *Wood* did not create a new rule. *See id.* at 172. Indeed, the United States Supreme Court explained that an automatic reversal is not the appropriate means of enforcing *Sullivan*'s mandate of inquiry. *See id.* at 173. Subsequently, after noting that some Courts of Appeals had applied *Sullivan* "unblinkingly" to all kinds of attorney ethical conflicts, which included a counsel's potential financial interests, the United States Supreme Court reiterated that "the language of *Sullivan* itself does not clearly establish, or indeed even support, such an expansive application." *See id.* at 174, 175. Thus, the United States Supreme Court stated in *Mickens* that whether the rule in *Sullivan* should be extended to such cases remained an open question. *See id.* at 176. Accordingly, as explained by the Supreme Court,

> [s]ince this was not a case in which . . . counsel protested his inability simultaneously to represent multiple defendants; and since the trial court's failure to make the *Sullivan*-mandated inquiry does not reduce the petitioner's burden of proof; it was at least necessary, to void the conviction, for petitioner to establish that the conflict of interest adversely affected his counsel's performance. The Court of

> Appeals having found no such effect . . .denial of habeas relief must
> be affirmed.

*Mickens*, 535 U.S. at 173–74 (internal citation omitted).

Post-*Mickens*, courts have noted in the § 2254 habeas context that the only clearly established federal law presuming prejudice as espoused by the United States Supreme Court in this arena of ineffective assistance of counsel arising from conflicts of interest is when counsel represents multiple clients with divergent interests. *See Birch v. Baker*, 711 F. App'x 852, 853 (9th Cir. 2017); *James v. Herbert*, 57 F. App'x 894, 896 (2d Cir. 2003) ("the Supreme Court has identified only one circumstance as constituting a *per se* conflict of interest: compelled representation of multiple defendants with divergent interests."); *Acklin v. Dunn*, No. 18-885, 2021 WL 4477632, at *16 (N.D. Ala. Sept. 30, 2021) ("The Supreme Court later explained, in dicta, that *Sullivan* does not extend to any situation other than that of multiple concurrent representation.); *Knox v. White*, No. 21-5272, 2021 WL 9929398, at *17 (W.D. Wash. Aug. 5, 2021), *report and recommendation adopted as modified*, 2023 WL 346634 (W.D. Wash. Jan. 20, 2023) ("The Supreme Court's holdings concerning a Sixth Amendment conflict of interest have involved only a single attorney's concurrent representation of multiple defendants in the same criminal matter."); *Cano v. Williams,* No. 20-257, 2021 WL 1812626, at *16 (D. Colo. May 6, 2021) ("because Claim 4(b) is not premised on concurrent representation of multiple defendants in the same proceeding, there is no clearly established federal law to be applied under § 2254(d)(1).").[2]  Thus, where a petitioner shows that a third-party paid his legal fees, *Sullivan* and

---

[2] This Court notes in *Zepp*, 748 F.2d at 135, the United States Court of Appeals for the Third Circuit extended *Sullivan* to conflict of interest cases beyond those arising in the multiple representation context, such as when an attorney's personal interests are 'inconsistent, diverse, or otherwise discordant' with those of his client and [those interests] affected the exercise of his professional judgment on behalf of his client."  However, this Court notes that *Zepp* involved a case on direct appeal.  AEDPA, which applies in this case, requires a petitioner to show that the state court acted "contrary to," or "unreasonably applied clearly established federal law" as defined

*Wood* do not constitute "clearly established" federal law for the proposition that such an arrangement *automatically* creates an impermissible conflict of interest. *See Acklin*, 2021 WL 4477632, at *17.

In some respects, Petitioner's case is similar to the one addressed by the United States District Court for the Northern District of Alabama in *Acklin*. In *Acklin*, the petitioner argued his counsel had a conflict by claiming that his father, who was paying petitioner's attorneys' fees, threatened counsel that he would stop making payments to counsel if counsel presented evidence during the penalty phase of petitioner's trial that he was verbally and physically abusive towards petitioner and his family. *See Acklin*, 2021 WL 4477632, at *14. After the state courts denied this claim on the merits, Acklin brought an ineffective assistance of counsel claim due to a conflict of interest in a federal habeas petition filed pursuant to 28 U.S.C. § 2254. Like Petitioner in this case, the petitioner in *Acklin* relied heavily on *Wood* in arguing that this third-payer fee arrangement created an actual conflict of interest. *See Acklin*, 2021 WL 4477632, at *17. However, in rejecting petitioner's reliance on *Wood* to obtain federal habeas relief under § 2254, the Court explained that "[t]here is no reason to believe that the *Wood* Court would have found other third-party payer arrangements inherently suspect, such as when parents pay the legal fees for their children, a fairly common occurrence." *See* 2021 WL 4477632, at *17. Thus, the Court in *Acklin* determined that

---

by the United States Supreme Court to warrant *habeas* relief. *See* 28 U.S.C. § 2254(d)(1). Thus, in *Zepp*, the Third Circuit did not have to analyze whether a state court's decision was contrary to clearly established federal law as held by the United States Supreme Court. Given the different factual and procedural underpinnings and considering what the United States Supreme Court expressly left open per *Mickens*, *Zepp* does not create "clearly established" federal law as defined by 28 U.S.C. § 2254(d)(1). *See Evans v. Davis*, 875 F.3d 210, 215 (5th Cir. 2017) (citing 28 U.S.C. § 2254(d)(1); *Renico v. Lett*, 559 U.S. 766, 778 (2010)) ("[C]ircuit [ ] precedents plainly do not constitute "clearly established Federal law, as determined by the Supreme Court."). Furthermore, even if *Zepp* does have some tangential application in this case, Petitioner fails to show that counsel's personal interests were inconsistent, diverse or otherwise discordant with his given that the Superior Court found Tomarsi Sr.'s "affidavit" to be not believable – a decision that as discussed *infra*, was not unreasonable.

the state court did not unreasonably apply or act contrary to clearly established federal law with respect to *Sullivan/Wood*.  For similar reasons, and for the reasons discussed above, this Court agrees and finds that the Superior Court did not act contrary to, or unreasonably apply clearly established federal law by holding that the alleged third-party fee transaction between Tormasi Sr. and Petitioner's counsel created a *per se* conflict of interest such that prejudice should be presumed.

2. *Step Two – The denial of Petitioner's claim by the Superior court was not based on an unreasonable determination of the facts as Petitioner fails to show by clear and convincing evidence that the Superior Court's non-believability findings were incorrect.*

Having determined that the purported fee payments by Tormasi Sr. to Petitioner's trial counsel do not create, in an of themselves, a *per se* actual conflict of interest such that prejudice should be presumed, this Court will next analyze the underlying factual support in the state court record to determine whether there was prejudice in this case.  *See, e.g.*, *Acklin*, 2021 WL 4477632, at *17 (analyzing whether state court unreasonably determined the facts of the record when petitioner claimed his attorney had an actual conflict of interest when petitioner alleged his father would stop paying petitioner's legal fees if counsel introduced evidence of his abuse of petitioner as a child).  In doing so, this Court will analyze whether: (1) the state court's finding that Tormasi Sr.'s "affidavit" was not believable; and (2) that Petitioner's siblings' testimony in support of Tormasi Sr.'s "affidavit" also was not believable.  As once again, the "affidavit" forms the essential "hook" for Petitioner to establish prejudice.  For the following reasons, this Court finds that Petitioner fails to show by clear and convincing evidence that these non-believability findings were incorrect.  Accordingly, Petitioner fails to show that the denial of this ineffective assistance/conflict of interest claim by the Superior Court was based on an *unreasonable* determination of the facts.

The "affidavit" states in part that Tormasi Sr. met with Petitioner's trial counsel prior to trial and gave him money in exchange for his "loyalty." (*See* ECF 16-63 at 159). The "affidavit" continues by stating that Tormasi Sr. told counsel the initial $5,000 payment was so that he would not present evidence at trial of Tormasi Sr.'s responsibility for murdering Petitioner's mother. (*See id.*). The "affidavit" further states that Tormasi Sr. told counsel he would give him an additional $5,000 during the trial if it was going to his liking. (*See id.*). The "affidavit" explains Tormasi Sr. gave Petitioner's trial counsel another $5,000 on January 21, 2008, during Petitioner's trial with similar instructions not to implicate him in the murder of his wife. (*See id.* at 160). The state court record included copies of two checks from Tormasi Sr. dated November 17, 1997 and January 20, 1998, made out to cash and to Tormasi Sr., respectively, in the amounts of $5,000 each. (*See* ECF 11-63 at 168, 172). The memo section for each check states "Legal (White)." (*See id.*).

Courts are generally guided by several factors in assessing the credibility of a witness' statements. Among such things that courts typically examine are the following:

> (1) The opportunity and ability of the witness to see or hear or know the things about which the witness testifies;
> (2) The quality of the witness knowledge and understanding, and memory;
> (3) The witness appearance, behavior, and manner while testifying;
> (4) Whether the witness has an interest in the outcome of the case or any motive, bias, or prejudice;
> (5) Any relation the witness may have with a party in the case and any effect that the [outcome] may have on the witness;
> (6) Whether the witness said or wrote anything before [his testimony] that is different from the witness testimony in court;
> (7) Whether the witness testimony is consistent or inconsistent with other [believable] evidence . . . . and
> (8) Any other factors that bear on whether the witness should be believed. Inconsistencies or discrepancies in a witness testimony or between the testimony of different witnesses may or may not cause [one] to disbelieve that witness testimony.

Third Circuit Model Crim. Jury Instructions § 1:10.

In ultimately finding Tormasi Sr.'s "affidavit" not believable, the New Jersey Superior Court expressly noted several areas which led it to this conclusion. Indeed, the New Jersey Superior Court noted that the "affidavit" contradicted Tormasi Sr.'s prior sworn statements in multiple respects. This Court has reviewed and compared Tormasi Sr.'s trial testimony along with his certification from 1999 to the "affidavit" and finds the state court's reasoning on this point was not unreasonable.

For example, the 1999 certification (along with Tormasi Sr.'s trial testimony) contradict Tormasi Sr.'s "affidavit" regarding the circumstances surrounding the October 1995 burglary. At trial and in his 1999 certification, Tormasi Sr. stated that his home was burglarized in October 2005. (*See* ECF 11-89 at 36, ECF 14-13 at 156-57). However, in his "affidavit," Tormasi Sr. purportedly stated that he staged the burglary himself in part to account for the purportedly now missing nine-millimeter Taurus firearm. (*See* ECF 11-63 at 142). The "affidavit" also directly contradicted Tormasi Sr.'s trial testimony regarding how he obtained firearms from uncle Joszef Toth. Indeed, at trial, Tormasi Sr. testified Toth brought him the firearms "out of the blue," and that he never requested Toth bring them to him. (*See* ECF 11-89 at 38). At trial, Tormasi Sr. testified that Toth gave him the firearms as a gift. (*See id.*). Comparatively, the "affidavit" directly contradicted Tormasi Sr.'s trial testimony on this point by stating he specifically requested Toth purchase firearms for him, mindful that Michael Falcon purportedly told him he needed "large-caliber" firearms. (*See* ECF 11-63 at 141). As indicated above, the prior sworn statements by Tormasi Sr. at Petitioner's trial and in 1999 which are in direct conflict with the "affidavit" certainly impact the believability of the "affidavit."

Tormasi Sr.'s unsigned "affidavit" is also directly contradicted by Falcon's sworn testimony in state court. Indeed, Falcon completely rejected under oath Tormasi Sr.'s "affidavit" that he paid him to carry out act of violence. (*See* ECF 11-95 at 11).

Petitioner sought to buttress the believability of his deceased father's unsigned and unnotarized "affidavit" through the testimony of his siblings, Attila Jr. and Sophia. Both siblings testified during Petitioner's PCR proceedings that in 2003-04, when they discovered the "affidavit," Tormasi Sr. told them that what was contained in the "affidavit" was true. (*See* ECF 11-94 at 15-17, 49-50). Both siblings recalled viewing the "affidavit's" signature/notarized last page that had now gone missing. (*See id.* at 15, 49). However, both Attila Jr. and Sophia testified they did not tell their brother, who, by this point, had already spent years in prison for murdering his mother, at least in part because they were afraid of their father. (*See, e.g.*, ECF 11-94 at 17, 50).

In finding Attila Jr.'s and Sophia's testimony not believable, the Superior Court noted that Attila Jr. wrote to Petitioner immediately after Tormasi Sr. died. (*See* ECF 14-1 at 124). However, despite having purported knowledge of their brother's purported innocence, but having purportedly kept it a secret for several years, and now no longer under any threat from their father due to his passing, Attila Jr. still did not disclose Tormasi Sr.'s confession to Petitioner at that time. Instead, it was not disclosed to Petitioner until sometime thereafter. The state court was correct to question the believability of Petitioner's siblings' testimony given their relationship to Petitioner along with items in the record such as the November 10, 2010 letter.

Ultimately, the New Jersey Superior Court found the "affidavit," not believable. This Court does not find that Petitioner has shown by clear and convincing evidence that the state court's determination that the "affidavit" was not credible, nor that Petitioner's siblings' testimony

which sought to buttress the statements within the "affidavit" was not believable, was incorrect. Thus, the denial of this claim was also not based on an *unreasonable* determination of the facts. Indeed, as described above, the record supports the Superior Court's non-believability findings.

Having failed to show that there was a conflict of interest to presume prejudice and having failed to show that the Superior Court's decision was contrary to, or unreasonably applied clearly established federal law, or that the denial of Petitioner's claim was based on an unreasonable determination of the facts, Petitioner is not entitled to federal habeas relief on his sole ineffective assistance of counsel claim regarding a conflict of interest.

Having found no actual conflict of interest, the Superior Court's statement that Petitioner failed to show prejudice does not entitle Petitioner to habeas relief. This finding was not contrary to, or an unreasonable application of clearly established federal law nor was this decision based on an unreasonable determination of the facts. Indeed, as noted by the New Jersey Superior Court, the case implicating Petitioner in the murder of his mother was strong. Two witnesses placed Petitioner at the scene of the murder seconds before she was shot. Other witnesses testified that earlier in the day before Petitioner killed his mother, he indicated to them that he intended to kill her that evening. Another witness testified that Petitioner asked him how to get gun residue off his hands. Finally, a fellow inmate of Petitioner's testified that Petitioner confessed to killing his mother to him. Petitioner does not contest this evidence produced against him at trial in this federal habeas proceeding.

Accordingly, for these reasons, Petitioner is not entitled to federal habeas relief.

## 3. APPLICATION TO PROCEED *IN FORMA PAUPERIS*

On September 23, 2023, this Court issued a Memorandum and Order permitting Petitioner to apply to proceed *in forma pauperis*. (*See* ECF 17). This Court sent Petitioner a blank *in forma*

*pauperis* application in the event this Court determined further briefing and/or oral argument was necessary to assist the Court such that appointing counsel to Petitioner would possibly be necessary. Petitioner subsequently filed an *in forma pauperis* application. (*See* ECF 18). That application will be denied without prejudice. Local Civil Rule 81.2(c) indicates that *in forma pauperis* shall not be granted to habeas petitioners whose prisoner accounts exceeds $200.00. Petitioner's attached prisoner account indicates it has within it an amount that exceeds this $200.00 threshold limit. (*See* ECF 18 at 4).

### 4.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

Applying this standard, this Court will grant Petitioner a certificate of appealability. While Petitioner is not entitled to federal habeas relief, Petitioner's claim is adequate to deserve encouragement to proceed further should he elect to appeal this matter.

### V.    CONCLUSION

For the foregoing reasons, Petitioner's application to proceed *in forma pauperis* is denied without prejudice. Petitioner's habeas petition is denied, but a certificate of appealability shall issue on Petitioner's sole federal habeas claim that counsel was ineffective based on a third-party

fee transaction with Petitioner's father that created an impermissible conflict of interest.   An appropriate order shall be entered.


DATED:  February 28, 2023

_____
GEORGETTE CASTNER
United States District Judge